IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND GENERAL ELECTRIC
COMPANY,
                Plaintiff,

                                           CV 05-1321-PK

                                           FINDINGS AND
v.                                       RECOMMENDATION
                                         AND ORDER

CITY OF GLENDALE,
                Defendant.
_____

PAPAK, Magistrate Judge:

      On August 25, 2005, plaintiff Portland General Electric Company ("PGE") filed this

action against defendant City of Glendale ("Glendale"), seeking declaratory relief in connection

with the parties' dispute over the interpretation of their long-term energy sale and exchange

contract.  On June 14, 2007, Glendale filed a counterclaim alleging PGE's breach of that same

contract.  This court has jurisdiction over the parties' action pursuant to 28 U.S.C. § 1332, based

on the diversity of the parties' citizenship.

Page 1 - FINDINGS AND RECOMMENDATION AND ORDER

Now before the court are PGE's motion (#55) for summary judgment as to its claims for declaratory relief and as to Glendale's counterclaim for breach of contract, Glendale's motion (#70) for partial summary judgment as to certain narrow questions of PGE's liability only, and PGE's motion (#82) to strike certain evidence offered by Glendale.  I have considered the parties' motions, oral argument on behalf of the parties, and all of the pleadings on file.  For the reasons set forth below, PGE's motion for summary judgment should be granted in part and denied in part as discussed below, Glendale's motion for partial summary judgment should be denied, and PGE's motion to strike is denied.

## LEGAL STANDARD

### I.    Cross Motions for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues exist for trial.  *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996).  The substantive law governing a claim or defense determines whether a fact is material.  *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence.  *See*, *e.g.*, *Lytle v.*

*Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other. *See* Fed. R. Civ. P. 56; *see also, e.g., Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may not grant summary judgment where the court finds unresolved issues of material fact, even where the parties allege the absence of any material disputed facts. *See id.*

## II.    Declaratory Judgment

The federal courts are authorized to issue declaratory judgments only when to do so would not contravene the "actual case or controversy" requirement of Article III of the Constitution. *See* U.S. Const. Art. III, § 2, Cl. 1. Specifically, the federal courts may grant a claim for declaratory relief only where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941), *citing Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-242 (1937); *see also, e.g.,* 28 U.S.C. § 2201(a). In addition, the Supreme Court has stated that a declaratory judgment is only appropriate where it would completely resolve the case or controversy before the court. *See Calderon v. Ashmus*, 523 U.S. 740, 749 (1998).

## III.    Motion to Strike

### A.    Federal Civil Procedure Rule 12(f)

Federal Civil Procedure Rule 12 provides that the district courts "may strike from a

Page 3 - FINDINGS AND RECOMMENDATION AND ORDER

pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter"

on their own initiative or pursuant to a party's motion.  Fed. R. Civ. P. 12(f).  The disposition of a

motion to strike is within the discretion of the district court.  *See Federal Sav. & Loan Ins. Corp.*

*v. Gemini Management*, 921 F.2d 241, 244 (9th Cir. 1990).  Motions to strike are disfavored and

infrequently granted.  *See Stabilisierungsfonds Fur Wein v. Kaiser, Stuhl Wind Distribs. Pty.,*

*Ltd.*, 647 F.2d 200, 201, 201 n.1 (D.C. Cir. 1981); *Pease & Curren Refining, Inc. v. Spectrolab,*

*Inc.*, 744 F. Supp. 945, 947 (C.D. Cal. 1990), *abrogated on other grounds by Stanton Road Ass'n*

*v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir. 1993).

**B.    Inherent Power**

It is well established that the district courts enjoy an inherent power to manage and

control their own dockets.  *See*, *e.g.*, *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (affirming

"the power inherent in every court to control the disposition of the causes on its docket with

economy of time and effort for itself, for counsel, and for litigants").  It is clear that this inherent

power includes the authority to sanction procedural impropriety in an appropriate manner.  *See*,

*e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (noting that "[a] primary aspect" of

the courts' inherent power "is the ability to fashion an appropriate sanction for conduct which

abuses the judicial process;" holding that because "outright dismissal of a lawsuit . . . is within

the court's discretion," in consequence less severe sanctions are "undoubtedly within a court's

inherent power as well"); *Atchison, T. & S.F. Ry. v. Hercules Inc.*, 146 F.3d 1071, 1074 (9th Cir.

1998) ("well established that district courts have inherent power to control their dockets and may

impose sanctions, including dismissal, in the exercise of that discretion") (citations, internal

quotation marks omitted); *see also Lamos v. Astrue*, 2008 U.S. App. LEXIS 9143 (9th Cir. 2008)

Page 4 - FINDINGS AND RECOMMENDATION AND ORDER

(unpublished disposition) (affirming inherent power of the courts to strike documents other than pleadings from the docket); *Centillium Communs., Inc. v. Atl. Mut. Ins. Co.*, 2008 U.S. Dist. LEXIS 20719 (D. Cal. 2008) (striking a procedurally improper motion pursuant to the court's inherent power).

FACTUAL BACKGROUND

## I.        Negotiation and Formation of the Contract

In September 1988, Glendale and a subsidiary of PGE's then-parent corporation, Portland General Exchange, Inc. ("PGX"), entered into a Long Term Power Sale and Exchange Agreement (the "Agreement") with an effective period that continues through September 2012. The Agreement was amended in 1992 to assign all of PGX's rights and obligations thereunder to PGE.  The Agreement was filed with and approved by the Federal Energy Regulatory Commission ("FERC") because it involved the sale of electric energy and power in interstate commerce.

## II.       Material Contractual Provisions

Under the Agreement, Glendale pays PGE two fixed, annual "capacity" fees, in exchange for PGE's promise to provide firm system capacity up to 20 MW.  The first of these is "an 'Annual Service Fee' which represents a fixed charge for Firm System Capacity and other rights" under the Agreement.  Agreement, § 10.1.  The amount of such Annual Service Fee for any given year during the term of the Agreement is not calculated based on any pricing formula but rather is fixed in advance, and is set forth on Schedule 1 of the Agreement.  *See* Agreement, § 10.1, Schedule 1.  The Agreement provides that:

Except as suspended pursuant to Section 7 or subsection 11.5 as a result of PG[E]

> nonperformance, or except if this Agreement has been properly terminated
> pursuant to the provisions of Section 7, Section 14, Section 16, subsection 11.5,
> subsection 24.2 or subsection 27.2, **Glendale's obligation to make the foregoing
> [Annual Service Fee] shall be absolute and unconditional**. Notwithstanding
> any provision of this Agreement other than Section 7 and subsection 11.5, it is
> intended that **the Annual Service Fee payments under this subsection 10.1
> shall be paid without counterclaim, setoff, deduction or defense and without
> abatement, suspension, deferment, diminution or reduction**. All payments by
> Glendale made hereunder shall be final and **Glendale shall not seek to recover
> any such payment or any part thereof for any reason whatsoever, unless
> PG[E] and Glendale agree there has been an error**. Agreement as to the
> existence of any such error shall not be unreasonably withheld.

Agreement, § 10.1.1 (emphasis supplied). Moreover, Section 14.1.2 of the Agreement reiterates

that PGE's default in performing its obligations does not "alter the unconditional nature of the

payments required under subsection 10.1" unless Glendale first terminates the Agreement as

provided in Section 14.1.1. Agreement, § 14.1.2.

The second of the annual capacity fees is "an 'Annual Energy Fee'" constituting an

additional "fixed charge for energy available to Glendale." Agreement, § 10.2. Like the Annual

Service Fee, the Annual Energy Fee is not calculated based on any pricing formula, but rather is a

charge fixed in advance and set forth for each year of the effective period of the Agreement in

Schedule 2. *See* Agreement, § 10.2, Schedule 2. Glendale is obliged to pay the Annual Energy

Fee in monthly installments, "[u]nless specifically excused pursuant to Section 7 or subsection

11.5" of the Agreement. Agreement, § 10.2.

In addition, the Agreement provides formulas for the calculation of variable costs for

energy actually supplied to Glendale, on Glendale's demand. The pricing provisions of the

Agreement are contained in Section 3, as follows:

> Prior to the time established for Glendale to schedule energy . . . , PGE shall
> notify Glendale of the estimated price for energy to be provided pursuant to

Page 6 - FINDINGS AND RECOMMENDATION AND ORDER

subsection 3.2.  Such estimated price shall be at the point of delivery and shall be inclusive of the margin, if any, to be charged pursuant to subsection 3.4.1.

Agreement, § 3.4.  Section 3.4.1, in turn, provides that:

The price per kilowatt hour to be paid by Glendale for energy delivered by PG[E] pursuant to subsection 3.2 shall be PGE's Incremental Variable Production Costs delivered at NOB multiplied by a factor of 1.05, except as specified in subsections 3.4.2, 3.4.3 and 3.4.4.  "Incremental Variable Production Costs" are PGE's daily incremental variable costs of providing one MW of incremental energy to Glendale and is based upon the costs of producing or purchasing, if economic, one MW of incremental energy above PGE's requirement to serve its Native Load, PGE's firm obligations listed in Exhibit B, except the 1986 Southern California Edison Company obligations, plus 87 MW of firm service.  Such variable costs shall include fuel costs, energy purchase costs, third party non-intertie wheeling and losses to the Point of Delivery and shall exclude fixed costs.

Agreement, § 3.4.1.  Section 3.4.2 provides that:

On a daily basis PG[E] shall have the option to quote Glendale a "market price" at the Point of Delivery for all or any portion of the energy to be provided by PG[E] on such day pursuant to subsection 3.2.  PG[E] may set such market price at whatever level it desires, as long as such price is less than or equal to the price which would have been derived pursuant to subsections 3.4.1 or 3.4.3.  Any such quote shall be made by PG[E]'s schedulers to Glendale's schedulers, shall be clearly identified as a market price quote" and shall be inclusive of all margins.

Agreement, § 3.4.2.  Section 3.4.3 provides that:

A Cap Incremental Cost of 22.0 mills/kWh is established as of January 1, 1987.  Such Cap Incremental Cost shall be adjusted as of January 1, 1988 and as of each January 1 thereafter to reflect all changes in the per unit variable cost of Cap Resources; provided, however, that no such adjustments shall reduce this value below 22.0 mills/kWh.  The Cap Incremental Cost value shall be adjusted pursuant to [a] formula [provided.]

* * *

PG[E] shall provide Glendale written notice of each adjustment made as provided above as soon as reasonably possible after the conclusion of each calendar year; no adjustment shall be effective until Glendale has received such written notice.

If, for any hour, the lesser of the estimate pursuant to subsection 3.4 or any

Page 7 - FINDINGS AND RECOMMENDATION AND ORDER

"market price quote" pursuant to subsection 3.4.2 is greater than 1.05 times the
Cap Incremental Cost, Glendale may elect to (a) schedule deliveries for which the
price charged to Glendale shall be equal to the lesser of (i) the "market price
quote" or (ii) the greater of Incremental Variable Production Costs or 1.05 times
Cap Incremental Cost or (b) acquire capacity from PG[E], at no additional cost,
for the period during which the lesser of the estimate or the "market price quote"
exceeds 1.05 times Cap Incremental Cost. If Glendale elects the latter option, it
shall deliver energy to PG[E] during Off-Peak hours, and PG[E] shall return all
such energy to Glendale during On-Peak Hours on the next succeeding day which
includes On-Peak Hours. The rate of return during On-Peak Hours by PG[E] shall
be scheduled by Glendale subject to a maximum rate of return of 20 MWh/hr.

Agreement, § 3.4.3. Section 3.4.4 provides that:

The estimate given to Glendale pursuant to subsection 3.4 shall not be the price
charged to Glendale, and the price for energy derived pursuant to subsections
3.4.1 or 3.4.3 may be less than or greater than the estimate given. The price
charged to Glendale for the subject energy shall be the lesser of (a) the market
price quote, if quoted, or (b) the price calculated as provided in subsections 3.4.1
or 3.4.3.

Agreement, § 3.4.4.

Moreover, in the event the sum of Glendale's Annual Energy Fee and its variable energy

costs exceeded 120% of PGE's costs in delivering energy to Glendale during any operating year

of the effective period of the Agreement, Glendale would be entitled to a refund of a portion of

its payments. *See* Agreement, § 3.5.

In addition, the Agreement provides for mandatory renegotiation of the pricing

mechanisms of Section 3 – those governing Glendale's variable energy costs – in the event of

certain events, provided those events "significantly distort" the parties' bargain:

In the event of (i) merger(s) of PGX, PGE or Portland General Corporation with
another entity, (ii) acquisition of PGX, PGE or Portland General Corporation by
another entity, (iii) acquisitions by PGX, PGE or Portland General Corporation of
another entity or (iv) sale(s) by PGE of Cap Resources, which individually or
collectively result in a significant distortion in the Parties' bargain represented by
this Agreement, then either Party may request that the terms of Section 3 of this
Agreement be adjusted to avoid significant distortion in the parties' bargain as a

Page 8 - FINDINGS AND RECOMMENDATION AND ORDER

result of the subject acquisition or merger. Upon such request the parties shall
meet and negotiate in good faith substitute or supplementary provisions for
Section 3 to preserve the intent and benefits of the original Agreement. If the
parties fail to reach agreement within sixty (60) days, either Party may request
FERC to determine the necessary substitute or supplementary provisions to
Section 3 to preserve the intent and benefits of this Agreement and . . . any order
issued by FERC shall not give rise to a right to terminate this Agreement. If
FERC does not accept jurisdiction over such matter either Party may submit it to
binding arbitration under the rules of the American Arbitration Association.

Agreement, § 17.3. The Agreement defines "Cap Resources" as "[a]ll PGE resources listed on

Exhibit A, other than Beaver and Bethel, plus all purchases of power by PGE having a cost less

than the weighted average variable costs of operating PGE's then-existing combustion turbine

facilities. . . ." Agreement, § 1.6. Exhibit A lists as Cap Resources, *inter alia*, the Trojan nuclear

facility and two Centralia steam plants. *See* Agreement, Exh. A.

**III.    History of the Parties' Dealings Under the Contract**

In 1988, Glendale began making annual capacity payments to PGE, and from time to time

to purchase energy from PGE at prices calculated by PGE, purportedly pursuant to the pricing

provisions of Section 3.4 of the Agreement. The evidence in the record suggests that these price

calculations were complex, and that Glendale was not made privy to the methods PGE used to

perform the calculations.[1]

In 1992, PGE closed its Trojan nuclear facility, based on the results of a cost-benefit

analysis. PGE did not subsequently sell the site or the facility, but it has since sold equipment

from the facility. The closure of Trojan – a "Cap Resource" that was relatively cheap to operate

for the production of energy – had a significant impact on the pricing of Glendale's variable

_____

[1] The evidence further suggests that PGE's historical price calculations may be difficult
to reconstruct.

Page 9 - FINDINGS AND RECOMMENDATION AND ORDER

energy costs.  Specifically, the closure of Trojan raised Glendale's variable energy costs by approximately 25%.

On September 8, 1993, Glendale wrote to PGE, presumably pursuant to Section 17.3 of the Agreement, demanding that the pricing terms of Section 3 of the Agreement be renegotiated due to the bargain-distorting effect of Trojan's closure.  The parties conferred to discuss the issue, but no resolution was reached.  Glendale did not thereafter submit the dispute to FERC or to binding arbitration, and did not otherwise pursue any remedy in connection with its demand for renegotiation until 2005.

In 1998, PGE assigned its interest in an energy exchange agreement, the WNP-3 Exchange Agreement, to a corporate affiliate.  In 1999, PGE sold its interest in another Cap Resource, one of its Centralia coal-burning facilities.  The uncontradicted evidence in the record establishes that PGE continued to price Glendale's energy as though it had retained its interest in these two assets, so that the transactions did not have any actual distorting effect on Glendale's variable energy costs.

On May 26, 2005, Glendale requested formal resolution of disputes with PGE over renegotiation of pricing and refunds of alleged overcharges due to the closure of Trojan.  The parties conferred regarding the dispute, but again did not reach resolution.  PGE filed this action in August 2005, seeking declaratory judgment regarding the parties' contract dispute.

In 2006, PGE voluntarily modified its method for calculating prices under Section 3.4 of the Agreement, characterizing the change as switching from a "top-down" to a "bottom-up" method of determining which resources would be used in determining the price Glendale would be charged under the Agreement.  The evidence in the record suggests that the change was

Page 10 - FINDINGS AND RECOMMENDATION AND ORDER

intended "to, in some sense, make our model a little more literally conforming with the contract." True Depo. 86:2 - 89:1.

Glendale filed its counterclaim for breach of contract in June 2007.  PGE filed its motion for summary judgment November 10, 2008, and Glendale filed its motion for partial summary judgment January 12, 2009.

## ANALYSIS

### I.    Dispositive Motions

In its complaint, PGE requests this court's declaratory judgment that:  (i) PGE does not owe Glendale any refunds or reimbursement for overcharges or overpayments under Sections 3.4 or 3.5 of the Agreement, (ii) the decommissioning of PGE's Trojan facility did not trigger mandatory renegotiation of the agreement's pricing terms under Section 17.3, and (iii) Glendale is required to make specified, fixed annual charges as provided in Section 10 of the Agreement, without reduction.  For its part, Glendale alleges that PGE has breached the Agreement by (i) misapplying the pricing terms of Section 3.4 of the Agreement, resulting in systematic miscalculation of Glendale's variable energy costs and systematic overpayments by Glendale over the effective period of the Agreement, (ii) failing to refund amounts paid by Glendale toward its variable energy costs and its Annual Energy Fee that, in the aggregate, exceeded 120% of PGE's incremental costs incurred in providing energy to Glendale in any year of the Agreement's effective period, (iii) failing to renegotiate the pricing provisions of Section 3 following the decommissioning of the Trojan facility, the assignment of PGE's interest in the WNP-3 Exchange Agreement, and the sale of one of PGE's Centralia generations plants, (iv) failing to refund amounts paid by Glendale toward its fixed annual capacity fees that allegedly should have been

Page 11 - FINDINGS AND RECOMMENDATION AND ORDER

suspended or reduced in consequence of PGE's alleged failure to renegotiate the pricing

provisions of Section 3, and, arguably, (v) failing to refund amounts paid by Glendale toward its

fixed annual capacity fees that allegedly should have been suspended or reduced in consequence

of PGE's alleged misapplication of the existing pricing provisions of the Agreement.  PGE now

seeks summary judgment as to its claim for declaratory relief, as to Glendale's counterclaim for

breach of contract in its entirety, and as to certain of Glendale's affirmative defenses.  Glendale,

by contrast, seeks partial summary judgment only as to two narrow legal questions relating to

PGE's alleged liability for breach of contract, requesting this court's declaration that PGE's failure

to calculate Glendale's variable rates following the decommissioning of the Trojan facility as

though the facility remained operational triggered mandatory renegotiation of the variable pricing

mechanisms of the Agreement, and as to the correct interpretation of the term "if economic," as it

is used in Section 3.4.1 of the Agreement.

    The parties' dispositive motions raise several sets of interrelated legal issues.  Perhaps the

primary bone of contention in the parties' dispute is their disagreement over whether the Section

17.3 mandatory renegotiation provision was triggered by the 1992 decommissioning of the

Trojan facility, by the 1998 assignment of PGE's interest in the WNP-3 Exchange Agreement

and/or by the 1999 sale of the Centralia plant.  Glendale alleges that it was, and argues that, in

consequence, it is entitled to refund of amounts paid toward its variable energy costs in excess of

what it would have been required to pay had the pricing terms of Section 3 been renegotiated.  In

connection with this argument, Glendale also requests what it styles as this court's "declaratory

judgment" that the Agreement must "be implemented," in some unspecified sense, as though

such renegotiation had already occurred.  In addition, Glendale argues that PGE's alleged failure

to renegotiate the pricing terms of Section 3 constitutes grounds under Section 11.5 for the suspension of its obligation to pay its Section 10 annual capacity fees.

Independent of its allegations that PGE breached Section 17.3 by failing to renegotiate the Section 3 pricing provisions, Glendale alleges that throughout the effective period of the Agreement, PGE has systematically misapplied the pricing provisions as currently drafted, resulting in systematic overcharges for Glendale's energy purchases. Glendale argues that it is entitled to refund of its resulting overpayments, and further argues that PGE's alleged misapplication of the Section 3 pricing terms constitutes additional, independent grounds for the suspension of its obligation to pay its Section 10 annual capacity fees, pursuant to Section 11.5.

Finally, Glendale alleges that it is entitled to refund of certain amounts paid towards variable energy costs and the Annual Energy Fee pursuant to Section 3.5, apparently on the theory that, during one or more years since the Agreement was executed, the total of Glendale's variable energy costs and the Annual Energy Fee for each such year exceeded 120% of PGE's incremental costs for producing energy supplied to Glendale. It is unclear from Glendale's allegations whether it believes its alleged entitlement to a Section 3.5 refund is in whole or in part a consequence of the alleged overcharges summarized above. Neither party addresses the Section 3.5 issue in its briefing to the court.

A. **Section 17.3: Mandatory, Good-Faith Renegotiation of the Agreement's Pricing Provisions**

As noted above, Section 17.3 of the Agreement provides that PGE must renegotiate the pricing provisions of Section 3 "in good faith" upon being requested to do so by Glendale following, *inter alia*, any "sale(s) by PGE of Cap Resources, which individually or collectively result in a significant distortion in the Parties' bargain." Agreement, § 17.3. In connection with

Page 13 - FINDINGS AND RECOMMENDATION AND ORDER

its counterclaim, Glendale has alleged that three such distorting or potentially distorting sales have taken place – namely, the 1992 decommissioning of the Trojan nuclear facility, the 1998 assignment of PGE's interest in the WNP-3 Exchange Agreement, and the 1999 sale of the Centralia steam plant – and that PGE has breached Section 17.3 by failing to renegotiate the pricing provisions of Section 3 following each of these sales or transfers of interest.

PGE now moves for summary judgment as to its own claim for declaratory judgment that the decommissioning of Trojan did not trigger mandatory renegotiation of the pricing provisions of Section 3 and as to Glendale's claim for breach of contract to the extent premised on alleged breach of Section 17.3 in connection with any or all of the three candidate distorting events. Glendale opposes PGE's motion and seeks partial summary judgment as to PGE's liability for breach of Section 17.3 in connection with the decommissioning of Trojan only.

### 1.    The 1992 Closure of the Trojan Facility

In 1992, PGE elected to close and decommission its Trojan nuclear facility.  It is undisputed that the closure of Trojan had a significant, material effect on Glendale's variable energy costs, increasing such costs by an amount that may be estimated to be on the order of 25%.  It is further undisputed that Trojan was a "Cap Resource" as that term is used in the Agreement.

Pursuant to Section 17.3 of the Agreement, Glendale may initiate mandatory good-faith renegotiation of the pricing provisions of Section 3 following any "sale(s) by PGE of Cap Resources" where such sale or sales would otherwise distort the parties' bargain.  Glendale did, in fact, request such renegotiation in connection with the closure of Trojan on September 8, 1993, following which the parties conferred to discuss the issue, without resolution.  Glendale did not

Page 14 - FINDINGS AND RECOMMENDATION AND ORDER

subsequently submit the dispute to FERC or to binding arbitration, as arguably permitted by the Agreement.

The primary question for this court's determination is whether the closure and decommissioning of the Trojan facility constituted a *sale* for purposes of the Agreement. Tacitly conceding both that the plain language of Section 17.3 does not provide for mandatory renegotiation following the *closure* of a Cap Resource and that the term "sale" commonly refers to a formal transfer of ownership rather than to mere closure or other cessation of operations, Glendale argues that PGE's piecemeal sales of equipment from the facility following its decommissioning collectively constitute a distorting sale or sales.

Glendale correctly notes that there is no reason in principle to treat the sale of an energy-producing resource differently under the Agreement from the non-sale closure of any such resource. Particularly where, as here, the decision to shut such a resource down is entirely within PGE's discretion and control, any interpretation of the Agreement that would permit PGE to make a closure decision without renegotiating affected pricing provisions would necessarily create a perverse incentive for PGE to increase its profit margins by removing low-incremental-cost resources from its stack. Nevertheless, Glendale's reasoning is ultimately unpersuasive.

The plain language of the provision establishes that Glendale's right to mandatory renegotiation under Section 17.3(iv) can only be triggered by the distorting "sale" of a Cap Resource, and not by a mere closure or decommissioning. The language is not ambiguous. In negotiating the Agreement, Glendale could have insisted that mandatory renegotiation would be available whenever a resource closure or other cessation of operations significantly impacted its energy costs, but it elected not to do so. Although, as a practical matter, the distinction between

Page 15 - FINDINGS AND RECOMMENDATION AND ORDER

sales and other closures of Cap Resources makes little, if any, sense from either party's perspective, it is not for the court to rewrite the parties' agreement, but rather to interpret the contract as actually drafted.

Moreover, although PGE did sell equipment from the Trojan facility subsequent to its closure, such piecemeal sales could not have been distorting events under Section 17.3 in that the distortion of the parties' bargain had already occurred, in consequence of the facility closure (and by PGE's failure to calculate Glendale's variable energy costs as though Trojan were still operational), and not as a result of any subsequent sale or sales. Had PGE elected not to sell off equipment from the decommissioned facility, precisely the same distortion of the parties' bargain would have occurred, despite the absence of any event that arguably might have constituted a sale.

Because the closure and decommissioning of the Trojan facility was not a sale, the closure was outside the scope of Section 17.3. The closure therefore did not trigger Glendale's right to mandatory good-faith renegotiation of the pricing provisions of Section 3.

Furthermore, even if there were a question of fact as to whether the closure and decommissioning of the Trojan facility could constitute a sale for purposes of Section 17.3, Glendale's claim for breach of Section 17.3 in connection with such closure is necessarily time-barred. The limitations period applicable to breach of contract actions in Oregon is six years. *See* O.R.S. 12.080. On the theory that Trojan's failure to agree to substitution or supplement of the pricing terms of Section 3 following the closure of the Trojan facility could have constituted breach of the Agreement, such breach would have taken place, at the latest, sixty days following the date in September 1993 when PGE received Glendale's request for renegotiation. On this

theory, the limitations period ran in November 1999.  *See, e.g., Waxman v. Waxman & Assocs.*,

224 Or. App. 499, 512 (2008) (limitations period begins to run at the time the contract is

breached, except where the breach is fraudulently concealed, in which case the discovery rule

applies).  Because Glendale did not file its counterclaim until 2007, its breach of contract claim is

time-barred to the extent premised on the Trojan closure.

Glendale notes, correctly, that the limitations period does "not apply to actions brought in

the name of the state, or any county, or other public corporation therein, or for its benefit."

O.R.S. 12.250.  On this basis, Glendale argues that, as a California municipality, it enjoys a form

of sovereign immunity to the limitations period set forth in O.R.S. 12.080.  Glendale

misinterprets Section 12.250.  The use of the definite rather than the indefinite article in the

phrase "actions brought in the name of *the* state" strongly suggests that the provision applies only

to actions brought in the name of the state of *Oregon* or of an *Oregonian* municipality rather than

to actions brought in the name of foreign states or municipalities.  Furthermore, the Oregon Court

of Appeals' discussion in *Medford v. Budge-McHugh Supply Co.*, 91 Or. App. 213 (1988), of

Section 12.250 and of its history, and the similar discussions contained in the legal opinions cited

therein, suggest that Section 12.250 is the codification of a common law rule exempting only

local sovereign entities, rather than sovereigns generally, from local statutes of limitations.  *See*

*Medford v. Budge-McHugh Supply Co.*, 91 Or. App. 213, 216-219 (1988); *see also, e.g.,*

*Guaranty Trust Co. v. United States*, 304 U.S. 126, 132-136 (1938) (discussing common-law rule

exempting "the domestic 'sovereign'" from forum statutes of limitations and finding it

inapplicable to "foreign" sovereigns).  It does not appear that either Section 12.250 or the

common law rule that it codifies has ever been used to exempt a non-Oregonian state or

municipality thereof from any Oregon statute of limitations, and no reason exists in law or policy for so extending its applicability in this case.

Glendale further argues that its claim is not time-barred because PGE is in continuing violation of Section 17.3, and/or because with each monthly invoice PGE breaches Section 17.3 anew. Again, Glendale misinterprets Oregon law. Under Oregon law, the limitations period begins to run at the time a contract is breached, not at the time the plaintiff suffers consequent harm. *See*, *e.g.*, *Waxman*, 224 Or. App. at 512. Although Glendale points to what arguably might constitute ongoing *harm* resulting from PGE's alleged failure to renegotiate the Section 3 pricing provisions following the Trojan closure, ongoing harm is not the equivalent of an ongoing *breach*. *See*, *e.g.*, *Association of Unit Owners of Inn at Otter Crest v. Far W. Fed. Bank*, 120 Or. App. 125, 135 (1993) ("Although [plaintiffs] allege ongoing harm in the form of payments due under the sale and lease agreements, they do not allege that the breach itself is ongoing. Consequently, . . . the claim . . . is time-barred"). Here, the breach occurred, if at all, when PGE failed to agree to substitution or supplement of the pricing terms of Section 3 within sixty days following the date in September 1993 when it received Glendale's request for renegotiation. PGE's subsequent invoices do not constitute a series of discrete additional breaches of Section 17.3. Glendale's claim for breach of contract is therefore time-barred to the extent premised on PGE's 1992 closure of the Trojan facility.

For the foregoing reasons, and because the requirements for issuing a declaratory judgment are present here, PGE's motion for summary judgment should be granted insofar as PGE seeks declaratory relief that "the decommissioning of Trojan does not require PGE to renegotiate any rates or payments imposed on it under Section 17.3 of the [Agreement]," and

should further be granted as to Glendale's claim for breach of Section 17.3 to the extent premised on PGE's 1992 closure of the Trojan facility.  For the same reasons, Glendale's motion for partial summary judgment should be denied insofar as Glendale seeks to establish PGE's liability for breach of Section 17.3 in connection with Trojan's closure.

### 2.    The 1998 Assignment of PGE's Interest in the WNP-3 Exchange Agreement and the 1999 Sale of the Centralia Plant

In 1998, PGE assigned its interest in an energy exchange agreement, the WNP-3 Exchange Agreement, to a corporate affiliate.  In 1999, PGE sold its interest in one of its Centralia steam plants.  Although the WNP-3 Exchange Agreement is not listed as a "Cap Resource" on Exhibit A to the Agreement, the Agreement defines "Cap Resources" as "All PGE resources listed on Exhibit A . . . *plus* all purchases of power by PGE having a cost less than the weighted average variable costs of operating PGE's then-existing combustion turbine facilities. . . ."  Agreement, § 1.6 (emphasis supplied).  There is insufficient evidence in the record to permit any determination whether the WNP-3 Exchange Agreement could fall within the scope of the Agreement's definition of Cap Resources.  For purposes of analyzing the parties' motions, I will assume that the WNP-3 Exchange Agreement is a Cap Resource.  It is undisputed that the Centralia steam plant was a Cap Resource.

As noted above, Glendale may initiate mandatory good-faith renegotiation of the pricing provisions of Section 3 following any "sale(s) by PGE of Cap Resources" where such sale or sales would otherwise distort the parties' bargain, pursuant to Section 17.3 of the Agreement.  Here, the evidence in the record is undisputed[2] that, following both the assignment of PGE's

─────────────────────

   [2]  Indeed, Glendale's expert, Lon Peters, declares in support of Glendale's motion for partial summary judgment that PGE adjusted its pricing formulae in order to eliminate any

interest in the WNP-3 Exchange Agreement and the sale of the Centralia plant, PGE continued to price Glendale's variable energy costs as though each asset remained an operational PGE resource.  These transactions therefore had no distorting effect on the parties' bargain, and therefore, as a matter of law, cannot have triggered Glendale's right to mandatory renegotiation of the Section 3 pricing provisions.  For these reasons, and because the requirements for issuing a declaratory judgment are present here, PGE's motion for summary judgment should be granted as to Glendale's claim for breach of Section 17.3 to the extent premised on PGE's 1998 assignment of its interest in the WNP-3 Exchange Agreement and/or the 1999 sale of PGE's Centralia steam plant.

**B.    Section 3.4:  Calculation of Variable Costs Applicable to Glendale's Energy Purchases**

Under the Agreement, PGE is required to price Glendale's purchases of energy according to a formula specified in Sections 3.4, 3.4.1, 3.4.2, 3.4.3, and 3.4.4.  The formula requires PGE to use its least expensive energy-producing assets to satisfy its own needs, the needs of certain pre-existing customers and pre-existing firm commitments to provide capacity, plus a "buffer" of 87 MW, before meeting Glendale's energy needs.  Glendale's energy purchases would then be priced with the best price available after all of the foregoing obligations are satisfied.  The best price available is calculated as a 5% premium over either PGE's own lowest possible costs for producing the energy, using the lowest priced resources available after satisfaction of its senior commitments described above or, "if economic," the best price PGE can obtain for energy from third parties.

---

potentially distorting effect from the sale or transfer of the WNP-3 Agreement and Centralia.  *See* Peters Decl., ¶ 35.

The parties disagree as to whether Glendale is owed a refund of amounts it has paid towards the purchase of energy at prices calculated pursuant to the Section 3.4 pricing provisions. Glendale argues that, for two independent reasons, it is entitled to such a refund. First, Glendale argues that it is entitled to refund of amounts constituting overpayment on the theory (discussed above) that Glendale is entitled to Section 17.3 renegotiation of the pricing provisions, and consequent reduction in its variable energy costs. Second, Glendale argues that it is entitled to refund of amounts constituting overpayments on the theory that PGE has systematically misinterpreted and misapplied the Section 3.4 pricing provisions.

PGE now moves for summary judgment as to its own claim for declaratory judgment that Glendale is entitled to no refund of amounts paid pursuant to the Section 3.4 pricing provisions and as to Glendale's claim for breach of contract to the extent it seeks such refunds. Glendale opposes PGE's motion, and moves for partial summary judgment as to the interpretation of the phrase "if economic" as used in Section 3.4.1 of the Agreement.

>    **1.      Section 3.4 Refund Premised on Right to Renegotiation of Pricing Provisions**

Because, for reasons discussed above, the 1992 closure and decommissioning of the Trojan nuclear facility, the 1998 assignment of PGE's interest in the WNP-3 Exchange Agreement, and the 1999 sale of the Centralia steam plant did not trigger mandatory renegotiation of the pricing provisions of Section 3, Glendale has no right to amendment of the pricing provisions in consequence of any of these transactions. For this reason, and because the requirements for issuing a declaratory judgment are present here, PGE's motion for summary judgment should be granted as to its claim for declaratory relief to the extent it seeks this court's declaration that Glendale is not entitled to refund of amounts paid pursuant to the Section 3.4

Page 21 - FINDINGS AND RECOMMENDATION AND ORDER

pricing provisions of the Agreement, where Glendale's claim to such refund is premised on PGE's alleged failure to comply with the Section 17.3 renegotiation provision.

### 2.  Section 3.4 Refund Premised on Alleged Misapplication of Existing Pricing Provisions

As noted above, the parties disagree as to whether, over the course of the Agreement's effective period,  PGE has at all times correctly calculated Glendale's variable energy costs pursuant to Section 3.4.  Glendale alleges that PGE has misapplied the pricing provisions of Section 3.4 by (i) omitting to issue a market price quote as provided in Section 3.4.3, (ii) failing to comply with the cost-based price mechanism of Section 3.4.1, (iii) incorrectly interpreting the phrase "if economic" in Section 3.4.1, and (iv) "arbitrarily changing the logic used to calculate the price over time."  Glendale argues that, in consequence, it is entitled both to refund of overcharges in its variable energy costs and to suspension of or reduction in, as well as refund of amounts paid towards, its annual capacity fees.

### a.  Section 3.4.3 Market Price Quotes

Although Glendale alleges that PGE has systematically omitted to issue market-price quotes as provided in Section 3.4.3 of the Agreement, neither party addresses this issue in the summary judgment briefing, and the record is void of evidence regarding such alleged failure.  In the absence of such evidence, there is necessarily an open, unresolved question of material fact as to whether Glendale could be owed a refund of amounts paid toward variable energy costs, on a theory that it was deprived of contractually-guaranteed opportunities to purchase energy from third parties on the spot market rather than from PGE under the Agreement when economic to do so.  PGE's motion should therefore be denied both as to its claim for declaratory judgment and as to Glendale's counterclaim for breach to the extent those claims relate to Glendale's position that

it is entitled to refund of alleged Section 3.4 overcharges caused by such omissions.

       **b.**    **Section 3.4.1 Cost-Based Price Mechanism and Modifications to PGE's Calculation Methodology**

Glendale alleges that PGE has misapplied the cost-based price mechanism of Section 3.4.1. Although Glendale offers no argument in support of its opposition to PGE's summary judgment motion on this point, PGE itself has offered into the record affirmative evidence from which a trier of fact could conclude that PGE misapplied the pricing mechanism of Section 3.4.1 on at least some occasions. As noted above, in 2006 PGE voluntarily modified its methods of calculating prices under Section 3.4 of the Agreement, from a so-called "top-down" approach to a "bottom-up" method, in order "to, in some sense, make our model a little more literally conforming with the contract." True Depo. 86:2 - 89:1. In addition, Glendale offers the declaration of Lon Peters "that the top-down and bottom-up methods do *not* yield the same results." Peters Decl., ¶ 10 (emphasis original). There is therefore at least a question of material fact as to whether Glendale could be owed a refund of amounts paid toward variable energy costs, on a theory that PGE misapplied the formula described in Section 3.4.1 of the Agreement.

Glendale further alleges that PGE breached Section 3.4 by "arbitrarily changing the logic used to calculate the price over time," apparently with reference to PGE's 2006 modification to its method of calculating Glendale's prices. However, PGE did not and cannot have breached the Agreement merely by modifying its method of calculating Glendale's variable energy costs; any such breach could only have been by virtue of the fact that at least one of the methods employed constituted a misapplication of the relevant contractual provisions. Thus, this allegation adds nothing to Glendale's theory of breach not already effected by its allegation that PGE misapplied Section 3.4.1's price mechanism.

Page 23 - FINDINGS AND RECOMMENDATION AND ORDER

Because there is at least a question of material fact as to whether Glendale could be owed

a refund due to PGE's misapplication of the Section 3.4.1 formula, PGE's motion should be

denied both as to its claim for declaratory judgment and as to Glendale's counterclaim for breach

to the extent those claims relate to Glendale's position that it is entitled to refund of alleged

Section 3.4 overcharges caused by such misapplication.

c.    <strong>Interpretation of the Phrase "If Economic" as Used in Section 3.4.1</strong>

Nowhere in Glendale's moving papers or supporting argument does Glendale articulate its

preferred interpretation of the phrase "if economic" as used in Section 3.4.1 of the Agreement.  In

opposition to PGE's motion for summary judgment, Glendale argues that the phrase should be

interpreted to mean "having a cost less than the weighted average variable costs of operating

PGE's Beaver and Bethel combustion turbine units."  A portion of the argument in which this

interpretation is discussed is incorporated by reference into Glendale's arguments in support of its

own motion for partial summary judgment.[3]  In addition, Glendale requests this court's

declaration that the phrase must be interpreted consistently with the declaration of its expert, Lon

Peters.  Peters declares that "'if economic' must mean that only energy purchases whose price is

---

[3] Glendale's memorandum of law in support of its motion for partial summary judgment, which is less than a page in length, indicates in relevant part that issues related to "Equity [*sic*] Pricing" are discussed "in Defendant's Memorandum in Opposition to PGE's Summary Judgment Motion at pp. 7-9."  The memorandum contains no other argument in support of Glendale's position.  Glendale's opposition memorandum at pages 7-9 does not, as it happens, include any argument supporting either of Glendale's candidate interpretations, although it does contain a reference to Glendale's Beaver/Bethel interpretation.  In its reply memorandum in support of its motion for partial summary judgment, the only argument Glendale offers in connection with the interpretation of the phrase "if economic" goes solely to a matter not in serious dispute, namely, whether Glendale adequately pled its allegation that PGE breached Section 3.4.1 by misinterpreting the phrase.

*less than* the cost of PGE's own resources could be placed into the resource stack and influence Glendale's price." Peters Decl., ¶ 9 (emphasis original). There is no suggestion anywhere in the record that the two candidate interpretations could be mutually reconcilable.

The Oregon courts follow a three-step approach to determining the correct interpretation of a contractual provision:

> First, the court is to determine whether the contractual provision is ambiguous. A contractual provision is ambiguous if it is susceptible to more than one reasonable interpretation. In making that determination, the court is to consider the text and context of the provision. In addition, and consistently with the parol evidence rule, the court, in making that determination, is also to consider extrinsic evidence of the circumstances underlying the formation of the contract.
>
> Second, if the text, context, and circumstances of the contract's formation show that the provision is ambiguous, the court, in attempting to resolve that ambiguity, is to consider extrinsic evidence of the contracting parties' intent. Third, and finally, if the provision remains ambiguous after the first two steps have been followed, the court relies on appropriate maxims of construction to determine the provision's meaning.

*Nixon v. Cascade Health Servs.*, 205 Or. App. 232, 239 (2006) (citations, internal quotation marks, and footnotes omitted). Here, within and in consideration of the context of the pricing provisions of Section 3.4, there is no ambiguity as to the meaning of the phrase. The phrase "if economic," as used in Section 3.4.1 of the Agreement, can only mean that PGE may purchase energy from third parties and offer it to Glendale for resale at a 5% premium only if the cost of such purchase would be lower than PGE's own costs for producing a like amount of energy, using its least expensive available resources after satisfying all commitments senior to Glendale's as set forth in Section 3.4.1. Any other interpretation would lead to illogical, inconsistent pricing of Glendale's energy purchases.

To the extent Glendale may be requesting this court's declaration that "if economic" must

be interpreted to mean "having a cost less than the weighted average variable costs of operating PGE's Beaver and Bethel combustion turbine units," its motion for partial summary judgment as to the phrase's interpretation should therefore be denied.  Such an interpretation would clearly be at odds with the plain language of the Agreement.

To the extent Glendale may be requesting a declaration consistent with Peters' declared opinion, Peters' opinion is at least potentially ambiguous.  If Peters intended to declare that "if economic" must mean "having a cost less than the cost of *any* of PGE's resources," his proposed interpretation is likewise without support in the Agreement.  If Peters intended to declare that the phrase must mean "having a cost less than any of PGE's *then-available* resources after senior commitments have been satisfied as set forth in Section 3.4.1," such interpretation is consistent with the plain language of the Agreement – and is identical to PGE's own espoused definition.  If the parties agree as to the interpretation of the phrase, they may stipulate to it, but in light of the fundamental incoherence of Glendale's motion and the likelihood that Glendale does not intend to seek this court's declaration that PGE's interpretation of the phrase is correct, I recommend that Glendale's motion for partial summary judgment be denied to the extent it seeks a declaration as to the interpretation of the phrase "if economic."

>            d.      **PGE's Alleged Misapplication of "If Economic" in Calculating Glendale's Variable Energy Costs**

The record contains no evidence as to whether PGE ever overcharged Glendale for its purchases of energy based on its application of the Section 3.4.1 "if economic" price cap.  In the absence of such evidence, there is necessarily an open, unresolved question of material fact as to whether Glendale could be owed a refund of amounts paid toward variable energy costs, on a theory that PGE misapplied the "if economic" cap.  PGE's motion should therefore be denied

Page 26 - FINDINGS AND RECOMMENDATION AND ORDER

both as to its claim for declaratory judgment and as to Glendale's counterclaim for breach to the extent those claims relate to Glendale's position that it is entitled to refund of alleged Section 3.4 overcharges caused by such misapplication.

### C.    Fixed Annual Capacity Fees

As noted above, Section 10.1.1 provides that Glendale must pay to PGE an Annual Service Fee in a fixed amount set forth on Schedule 1 of the Agreement, and Section 10.2 of the Agreement provides that Glendale must pay to PGE an Annual Energy Fee in a fixed amount set forth on Schedule 2. Section 10.1.1 establishes that "Glendale's obligation to make the . . . [Annual Service Fee] shall be absolute and unconditional," and that other than as provided in Section 7 and/or Section 11.5 of the Agreement, "the Annual Service Fee payments . . . shall be paid without counterclaim, setoff, deduction or defense and without abatement, suspension, deferment, diminution or reduction." Agreement, § 10.1.1. Glendale agreed not to "seek to recover any such payment or any part thereof for any reason whatsoever, unless PG[E] and Glendale agree there has been an error." *Id.* Similarly, Glendale is obliged to pay the Annual Energy Fee "[u]nless specifically excused pursuant to Section 7 or subsection 11.5" of the Agreement. Agreement, § 10.2. Section 7 provides for suspension of Glendale's payment obligations in the event that the parties are unable to obtain reasonably acceptable alternative transmission service for energy provided by PGE to Glendale following an interruption of transmission by the Bonneville Power Administration, and is not alleged to be at issue here. Section 11.5 provides in relevant part that, in the event PGE "does not perform its obligations to provide capacity and energy pursuant to Section 3" of the Agreement, Glendale's fixed annual capacity fees shall be suspended for each day of PGE's nonperformance. Agreement, § 11.5.

Page 27 - FINDINGS AND RECOMMENDATION AND ORDER

The parties disagree as to whether Glendale may be entitled to refund of amounts it has paid toward its annual capacity fees. It is Glendale's position that PGE's alleged failure to renegotiate the pricing provisions of Section 3 (discussed above) constituted a default by PGE, the equivalent of nonperformance of its Section 3 obligations for purposes of Section 11.5. It is arguably also Glendale's position that PGE's alleged misapplication of the existing pricing provisions of Section 3 (also discussed above) constituted an independent default by PGE, and likewise the equivalent of nonperformance of its Section 3 obligations. Glendale argues that such constructive nonperformance either relieved Glendale of its obligation to pay the fixed annual capacity fees or entitled it to a reduction of those fees.

PGE now moves for summary judgment as to its own claim for declaratory judgment that Glendale is entitled to no reduction in its fixed annual capacity fee obligations and as to Glendale's claim for breach of contract to the extent it seeks refund of or reduction in Glendale's annual capacity fees. Glendale opposes PGE's motion, but does not affirmatively seek summary judgment in its own favor in connection with the annual capacity fees.

### 1.    Section 10 Refund Premised on Right to Renegotiation of Pricing Provisions

Because, for reasons discussed above, the 1992 closure and decommissioning of the Trojan nuclear facility, the 1998 assignment of PGE's interest in the WNP-3 Exchange Agreement, and the 1999 sale of the Centralia steam plant did not trigger mandatory renegotiation of the pricing provisions of Section 3, Glendale has no right to amendment of the pricing provisions in consequence of any of these transactions. Because Glendale has no such right, it likewise has no right to suspension of or reduction in its annual capacity fees premised on the theory that PGE has not performed its obligations under a constructively renegotiated

Page 28 - FINDINGS AND RECOMMENDATION AND ORDER

Section 3.  For these reasons, and because the requirements for issuing a declaratory judgment are present here, PGE's motion for summary judgment should be granted as to its claim for declaratory relief to the extent it seeks this court's declaration that Glendale is not entitled to refund of amounts paid toward its Section 10 fixed annual capacity fees, where Glendale's claim to such refund is premised on PGE's alleged failure to comply with the Section 17.3 renegotiation provision.

##### 2.    Section 3.4 Refund Premised on Alleged Misapplication of Existing Pricing Provisions

Glendale's pleading does not articulate a claim that the city is entitled to refund of or reduction in the fixed annual capacity fees based on PGE's alleged misapplication of the existing Section 3 pricing provisions.  However, at oral argument, Glendale clearly argued that it was, in fact, entitled to such a refund or reduction.  For purposes of analyzing PGE's motion, I therefore construe Glendale's answer as adequately pleading such a claim.

The only contractual mechanisms by which any modification of Glendale's obligation to pay the Section 10 annual capacity fees could be effected are suspension of the obligation pursuant to Section 7, suspension of the obligation pursuant to Section 11.5, or proper termination of the Agreement as a whole.  *See* Agreement, §§ 10.1.1, 10.2.  It is undisputed that Section 7 suspension and proper termination of the Agreement as a whole are not at issue here.  The only potentially applicable mechanism for modification of Glendale's Section 10 annual capacity fee obligations is, therefore, Section 11.5.

As noted above, Section 11.5 provides that Glendale's Section 10  annual capacity fee obligations shall be suspended "[i]f at any time PG[E] does not perform its obligations to provide . . . energy *pursuant to Section 3*. . ." for as long as PGE's nonexcused nonperformance

Page 29 - FINDINGS AND RECOMMENDATION AND ORDER

continues.  Agreement, §§ 11.5, 11.5.1. (emphasis supplied).  At the hearing on the parties'
dispositive motions, Glendale advanced the argument that PGE's alleged misapplication of the
existing Section 3 pricing mechanisms constituted a failure to provide energy as required by
Section 3, thus triggering Section 11.5 suspension of the annual capacity fees.

The interpretation of Section 11.5 has not been briefed to the court.  On the current
evidentiary record, it would be premature to issue a finding as to whether the suspension
provision contains an ambiguity, or as to how any such ambiguity should be resolved.  I therefore
recommend that the court deny PGE's motion to the extent it seeks this court's ruling that
Glendale is not, as a matter of law, entitled to any reduction in its Section 10 obligations and to
the extent it seeks dismissal of Glendale's construed claim for breach of Section 10 premised on
alleged misapplication of the Section 3 pricing provisions.

###    D.    Section 3.5 Refund

As noted above, Section 3.5 of the Agreement provides that if, during any operating year
during the effective period of the Agreement, Glendale's payments toward the Annual Energy Fee
and toward its variable energy costs exceeds 120% of PGE's costs in generating and delivering
Glendale's energy purchases, Glendale is entitled to a refund of a portion of its payments.  *See*
Agreement, § 3.5.

Although PGE now moves for summary judgment as to Glendale's claim for a refund
pursuant to Section 3.5, neither party addresses the Section 3.5 refund mechanism in its briefing,
nor have the parties offered evidence into the record from which a reasonable trier of fact could
reach any dispositive conclusion as to Glendale's Section 3.5 claim.  In the absence of
information as to whether, in any year the Agreement has been in effect, Glendale's relevant

payments exceeded 1.2 times PGE's incremental costs incurred that year, PGE's motion for

summary judgment should be denied as to its own claim for declaratory relief to the extent it

seeks a declaration that Glendale is owed no refund under Section 3.5, and as to Glendale's

counterclaim to the extent it alleges entitlement to a Section 3.5 refund.

### E.    Glendale's Affirmative Defenses

Glendale asserts affirmative defenses to PGE's claim for declaratory judgment based on

frustration of purpose, impracticability, impossibility, prevention of performance, waiver,

estoppel, and illegality.  PGE seeks summary judgment in its favor as to each of these defenses.

### 1.    Frustration of Purpose

Under Oregon law:

> The frustration of purpose doctrine allows rescission of a contract if one party's
> mutually understood "principal purpose" in entering into the contract is "frustrated
> * * * by the occurrence of an event the non-occurrence of which was a basic
> assumption" of the parties. Restatement (Second) of Contracts § 265 (1981).
> Thus, to obtain rescission, a party must show that (1) a particular purpose was its
> "primary purpose" in entering into a contract; (2) that purpose was "mutually
> understood," even if not mutually shared; (3) that purpose was substantially
> "frustrated"; and (4) the "frustration" was the result of circumstances that the
> parties mutually assumed would not occur--and, thus, the risk of the frustrating
> circumstance was not impliedly allocated to the party who later seeks rescission.

*Chang v. Pacificorp*, 212 Or. App. 14, 22 (2007) (finding that increased energy prices did not

frustrate the purpose of an energy contract) (modifications original).

Here, the increase in prices Glendale indisputably suffered did not frustrate the primary

purpose of the contract, which was to create an energy exchange between the parties.  Moreover,

the circumstances causing the increase constituted a possibility both parties were aware of.[4]  PGE

---

[4] Evidence in the record establishes that, at the time the Agreement was signed, Glendale was aware of the risk that Trojan might be closed by ballot measure. *See* Silva Dep., 28:4-29:25.

is therefore entitled to summary judgment as to Glendale's frustration of purpose affirmative defense.

### 2.    Impossibility and Impracticability

Under Oregon law:

> In applying the doctrine of impossibility, courts recognize that unexpected difficulty or expense  may approach such an extreme that a practical impossibility exists.  To operate as a discharge, however, the hardship must be so extreme as to be outside any reasonable contemplation of the parties.

*Portland Section of Council of Jewish Women v. Sisters of Charity*, 266 Or. 448, 457-458 (1973) (citations omitted), *quoting Savage v. Peter Kiewit Sons' Co.*, 249 Or. 147 (1968).  In Oregon, it appears that there is no distinction between the defenses of impossibility and impracticability. *See*, *e.g.*, *Beck v. J. M. Smucker Co.*, 277 Or. 607, 613 (1977).

Here, the increase in Glendale's variable energy costs occasioned by the closure of the Trojan facility – on the order of 25% -- was not so extreme as to be outside any reasonable contemplation of the parties.  PGE is therefore entitled to summary judgment as to Glendale's impossibility and impracticability affirmative defenses.

### 3.    Prevention of Performance

"It is a well-established rule of law that a party who prevents another from performing a duty under the terms of a contract cannot avail himself of the other's failure to perform." *Gilbert v. California Oregon Power Co.*, 223 Or. 1, 15-16 (1960) (citations omitted).  The prevention of performance doctrine is inapplicable here, however, as Glendale has not been prevented from performing its obligations under the contract and, indeed, has performed them.  PGE is therefore entitled to summary judgment as to Glendale's prevention of performance affirmative defense.

### 4.    Waiver

Under Oregon law, "adults with the capacity to do so generally are free to waive a panoply of rights, statutory and constitutional, so long as the waiver is knowing and intentional." *McInnis & McInnis*, 199 Or. App. at 236 (citations omitted); *see also, e.g.*, *Bennett*, 332 Or. at 156-157 (noting that "waiver . . . appl[ies] broadly to any contract term" and finding waiver of contractual rights enforceable where voluntary and unequivocal); *McMillan*, 194 Or. App. at 153 ("A contractual waiver requires the intentional relinquishment of a known right, manifested in an unequivocal manner").

Here, the record is void of evidence that PGE voluntarily or knowingly waived any right as to which it now seeks vindication.  PGE is therefore entitled to summary judgment as to Glendale's affirmative defense of waiver.

### 5.    Estoppel

Under Oregon law, the elements of promissory estoppel are:

(1) a promise
(2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind which occurred,
(3) actual reliance on the promise,
(4) resulting in a substantial change in position.

*Neiss v. Ehlers*, 135 Or. App. 218, 223 (1995) (internal quotation marks omitted), *quoting Bixler v. First National Bank*, 49 Or. App. 195, 199-200 (1980).

"To constitute an equitable estoppel, or estoppel by conduct, (1) there must be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; and (5) the other party must have been induced to act upon it."

*Guardian Mgmt., LLC v. Zamiello*, 194 Or. App. 524, 530 (2004), *quoting Bennett v. City of Salem et al.*, 192 Or. 531, 541 (1951).

Here, Glendale does not allege either a promise or a false representation made by PGE upon which Glendale materially relied.  PGE is therefore entitled to summary judgment as to Glendale's affirmative defense of estoppel.

### 6.   Illegality

The Oregon Supreme Court has observed as follows:

> It is often stated that courts will not enforce "illegal" contracts. This is an oversimplification of a legal principle, the application of which often involves construction of statutes and contractual provisions, delineation and balancing of public policies, and a difficult sorting and sifting process.
>
> If the consideration for the contract or its agreed purpose is illegal or against public policy on its face, it will not be enforced.

*Hendrix v. McKee*, 281 Or. 123, 128 (1978).

However, the doctrine of illegality is not at issue here.  Neither the purpose of the Agreement nor the consideration thereunder tendered is either illegal or in contravention of any identified public policy.  PGE is therefore entitled to summary judgment as to Glendale's illegality affirmative defense.

## II.   Motion to Strike

PGE moves, pursuant to Federal Civil Procedure Rule 12(f), to strike certain evidence offered by Glendale from the docket.  Federal Civil Procedure Rule 12(f) permits the courts to "strike *from a pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f) (emphasis supplied); *see also*, *e.g.*, *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983) ("[u]nder the express language of the rule,

only pleadings are subject to motions to strike"); *United States v. Crisp*, 190 F.R.D. 546, 550 (E.D. Cal. 1999) ("[a] motion to strike is limited to pleadings").  Glendale's proffered evidence is not contained within a pleading.  As such, the evidence is outside the scope of what may be stricken pursuant to Rule 12(f).

Moreover, there is no evident reason for the court to exercise its inherent power to control its docket by striking the subject evidence.  Inadmissible material contained in any document offered into evidence by either party will be and has been disregarded by the court.

For the foregoing reasons, PGE's motion to strike is denied.

## CONCLUSION

For the reasons set forth above, I recommend that PGE's motion (#55) for summary judgment be granted as to its claim for declaratory relief to the extent it seeks this court's declaration that "the decommissioning of Trojan does not require PGE to renegotiate any rates or payments imposed on it under Section 17.3 of the [Agreement]," to the extent it seeks this court's declaration that Glendale is not entitled to refund of amounts paid toward variable energy costs in connection with alleged overcharges premised on failure to renegotiate the pricing provisions of Section 3, and to the extent it seeks this court's declaration that "Glendale is required to make payments to PGE without reduction pursuant to Sections 10.1, 10.1.1, and 10.2 of the [Agreement]" where such reduction is premised on failure to renegotiate the pricing provisions of Section 3, and otherwise denied as to its claim for declaratory relief; that PGE's summary judgment motion be granted as to Glendale's counterclaim for breach of contract to the extent it alleges breach of Section 17.3 of the Agreement, to the extent it seeks refund and/or reduction of amounts paid toward variable energy costs based on PGE's alleged failure to renegotiate the

Page 35 - FINDINGS AND RECOMMENDATION AND ORDER

pricing provisions of Section 3, and to the extent it alleges overpayment of the fixed annual fees

provided in Section 10, based on PGE's alleged failure to renegotiate the pricing provisions of

Section 3 and otherwise denied as to Glendale's counterclaim for breach; and that the motion be

granted as to Glendale's affirmative defenses of frustration of purpose, impracticability,

impossibility, prevention of performance, waiver, estoppel, and illegality.  I further recommend

that Glendale's motion (#70) for partial summary judgment be denied.  PGE's motion (#82) to

strike is denied.

### SCHEDULING ORDER

The above Findings and Recommendation and Order will be referred to a United States

District Judge for review.  Objections, if any, are due June 8, 2009.  If no objections are filed,

review of the Findings and Recommendation will go under advisement on that date.  If

objections are filed, a response to the objections is due fourteen days after the date the objections

are filed and the review of the Findings and Recommendation will go under advisement on that

date.

Dated this 22nd day of May, 2009.

  /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge

Page 36 - FINDINGS AND RECOMMENDATION AND ORDER